The next case is number 2011-14-34, Rexnord Industries against Coppins. Mr. Crouch. May it please the court. Let's say that we have a hole and I want a design that will keep fingers out of the hole. How in the world am I going to solve that problem? Well, I can measure the size of a little finger. Mine's about 12-14 millimeters. And I can make the hole smaller than that, say 10 millimeters. Let's say I have a golf ball that I want to keep out of that hole. How am I going to solve that problem? Same way. Golf ball is about four centimeters across. So let's make the hole three and three quarters, maybe three and a half centimeters just to be safe. How hard is that? Well, so you're talking about the obviousness issue, not the anticipation. Correct. The anticipation doesn't, even if we agree with what you said, it doesn't get you there on anticipation. Pardon me? Even if we agree with what you said, it doesn't get you there on anticipation. Absolutely. And I'll get to anticipation. But the biggest flaw with the board's decision is they completely failed to carry out a KSR, common sense, obviousness. Well, what was going on? Were they looking at the 10 millimeters and they would just look? Yeah, I think that's what happened. They threw the baby out with the bathwater. They were wound up with the metaphysical question of whether a closed or covered space can be a space. And reasonable minds could differ about that. It's kind of a glass half full, glass half empty kind of thing. And they completely failed to address the issues that we had been raising from the very beginning in this case, despite what the director said. Yeah, I was going to ask you about that. Except that the board at the end of the day, as represented here by the director, says that you failed to raise this or to preserve it appropriately. Absolutely false. And I think one thing that's telling is that Habesitz lawyers, who have been in this battle since 2003 with us, they know we've raised that argument from the very beginning and they did not make that waiver argument. And here's why. Take a look at page A673. This is our 2005 request for reexamination. This is the document that the director says, at page 31, says we never made the obvious design choice argument. We take that full paragraph there, that second full paragraph, and talk about how Thompson can be modified based on obvious, it's merely a design choice, that the 10 millimeter gap is merely a design choice, obvious. Now remember, this is pre-KSR. So we do go on in the next paragraph and make the argument, because back in those days, people were not really using the common sense obviousness argument so much. We went and also made as an alternative argument that the closed space can be a space that's less than 10 millimeters, so that you could find the express reference in the art to this particular claim element. And we continued making that statement. But was that what was missing in the board? Was that what the board concluded was missing in the obviousness analysis? Only the dimension, nothing else, none of the other limitations in this? Absolutely. That's all they did. They said this is the dispositive issue. There were multiple anticipation and obviousness rejections done by this very careful, thorough examiner. And they fixated on the one alternative ground that we had advocated and that the examiner had adopted and ignored everything else. They said, we don't think that the glass is half full. They say that a closed space is not a space, and we're just throwing the whole thing out. And they refused to conduct a proper obviousness analysis under KSR. So what is the proper analysis under KSR in your view? We've got Horton and Thompson. We have Horton and Thompson. And what we have here is, under KSR, all you have to do is show that common sense and a person of ordinary skill in the art can take known prior art structures such as Thompson, which discloses these plates and covers, and discloses that they can partially cover the gaps. It says that specifically. It just never says, and it says specifically, you can cover them up enough so that, and this is at A763, so that a person will be unable to get a finger stuck in the belts. We are not talking about recombinant, I can't even say it, DNA here. We are talking about a simple mechanical design. I am a liberal arts major. I think some of you might be too. It does not take an engineer to figure out that a finger is generally wider than 10 millimeters. That is the sole inventive element that they have left, or so they claim. Well, in fact, the patent here, in their specification, does refer to fingers as well. Exactly. It says that that is precisely at column four. I am actually looking at column five, where they say 10 millimeter width so as to prevent fingers of a user. Yeah, and they specifically tie the 10 millimeter dimension to fingers. You know, obviousness, it doesn't, and we also get criticized for not giving a clear explanation, or the examiner didn't give a clear explanation of obviousness. Well, the fact is, sometimes, obviousness is so obvious, it just doesn't take a lot of explanation. In fact, that's the definition of obvious. It is plain. This is plain. And right now, we have a patent that will prevent people from practicing prior art designs and modifying them to keep objects out of them, such as little fingers, because the board ignored the common sense obviousness analysis of KSR. And we made that argument every step of the way as an alternative to the closed space argument. It was always advanced as an alternative. The examiner liked it. I believe that the board says the examiner didn't even address a common sense obviousness argument, but I believe that reads the examiner's opinion way too closely, way too narrowly. She, at, for example, A279 and 280, and then again in her answer before the board at A183 and 191 and 92, reference specifically that she acknowledges that Thompson shows not just fully covered spaces, but partially covered spaces. And she says that in connection with the obviousness analysis, which was the basis of ground number three for her rejections. So the board, I truly believe the board just got wound up on the closed space, open space issue and just ignored the rest. And that's why we're here. And we need you. We need you to do the right thing and save that baby that got thrown out with the bathwater. This is an obvious patent. And the only way it's going to be declared invalid is if you do the right thing and say it's invalid as obvious. I'd like to reserve the rest of my time. Okay. Thank you, Mr. Krauss. Ms. Kelly? Good morning, Your Honors. May it please the Court, the difficulty that Rexner and Faith is here is that, in fact, they didn't make this argument throughout prosecution history. Well, I'm having a hard time with that. I really am. So, I mean, just going to gray where they cite us the pages that they cited today, it's hard for me looking at the record to see how the argument essentially wasn't made and preserved below. Well, for two reasons, both factual. First, that was an argument that was made in their initial request for inter-parties re-examination. That argument was not made again after that point. Once the examiner adopted their alternative reasoning, they never raised that argument again, not to the Board in their opening brief. And they never raised that argument, with all due respect, even to the Board in their request for a hearing. If you look to their request for a hearing before the Board at A34, they made an inherency argument. They made a 102 argument that Palmeer and Thompson inherently disclosed the size limitation. The only, if you look to the reply brief, the only site in the record that they cite you for this mere design choice argument is their initial request for inter-parties hearing at A673. What I hear the Board now and the office telling us on behalf of the Director is we don't care whether they are or whether they aren't entitled to a patent. We're a big-time court now, and if you didn't make this exact argument in the exact words, we're not going to pay any attention to you, just as if we're the Supreme Court. And never mind, we're going to grant or not grant or whatever, or do what we want, and ignore any argument that we can say is changed from what was made earlier. I see this, it pervades the Director's brief on this appeal, and I find that, and we see it more and more in the briefs on behalf of the Director. This is an administrative agency. I don't mean to lecture you, but I must say the more I see of it, the more I wonder about the agency doing its job to examine or to re-examine, and if it turns out that there's a new argument to be considered, which doesn't come to the fore until we have a series of rejections or preliminary agreements, I say never mind, we're not going to pay any attention to that. We're going to issue an invalid patent, if that's their position, because you didn't tell us it was invalid early enough in the proceedings. Is that what I'm to take for your brief? No, Your Honor, and I would respectfully submit that that is not what was intended in our brief, and it is certainly not the agency's position. You say it over and over. They didn't say this before. They didn't say it until we had the rejection, and then it was relevant. We're not going to consider it. Just as the court, and I think you say, just as the court, raising the first time for a hearing to the board, just as the court doesn't consider these arguments, neither will we, the administrative agency. Is that the agency's position? No, it doesn't mean that we won't consider a rejection based upon that rationale. What that says is this party has made that argument too late to have it considered. I thought you just told us they made it too early, right? I mean, it is in the record here. I thought your argument was they made it too early. Well, there are two questions here. One is whether they actually… They made it at some point. You agree, right? Well, if I'd like to step back for a minute. There are two questions here. I have one from Judge Newman about what the agency's position is, and then there's another question about what argument they actually made earlier. You may have said it too early. You may have said it too late. Unless you do this precise stance that we have structured, we, the administrative agency, aren't going to be bothered with your argument. Well, I think that characterization is a little unfair. Respectful your honor. The dance was constructed by Congress, and Congress said… Getting to the right result. All right. I'm going to answer your questions, and I will come back to your questions. I appreciate that. Okay. If they came in to the agency with two rejections, they came in with a rejection based on Horton and Thompson-Palmier. The examiner said, I'm not adopting that rejection. In every reply brief through… I mean, in every one of their pleadings up until they got to the board, they said the examiner shouldn't have done that. The examiner should have considered this other rejection that was not adopted by the examiner, and then the board affirmed the examiner at that point. With respect to this other rejection, based on Palmier independently anticipating or Thompson independently anticipating, they offered two rationales to the examiner. One rationale was based on an express teaching of zero millimeters, a completely closed space, which we admit is less than 10 millimeters. The examiner said, okay, I like that rationale. And that's the only thing that they said, yes, that's the correct rationale. Eventually, through prosecution, they also said, oh, but you could also get to it at an intermediate point. This KSR analysis was never before the board, and they presented it for the… really articulated it in this particular fashion for the first time in their reply brief to this court. Okay. Well, forget the… So, when we're at this first stage, this other rationale, which isn't the same rationale they're saying to you now. Ms. Kelly, I'm sure you know, when you get a question from the bench, you ought to stop and listen to the question and then respond. Okay. I wanted to give you a chance to respond to Judge Newman, but I don't… it wasn't getting in the direction that I think honed in on it. I mean, the documents are replete. I mean, on 670 to 673, they were discussing the Horton patent in combination with Thompson teaches all the elements. And I think the examiner's stuff at A183, a ground three is listed as an obviousness rejection over Horton in view of Thompson. What I want to make clear is that whether or not they made a common sense, use the word common sense under KSR, that's one thing to me. But I'm wondering, I thought it was the director's view that they never raised this obviousness issue of Horton vis-a-vis Thompson as being obvious. Are you saying they raised that, but they just didn't make the… In even their Horton and Thompson, even in their articulation of this obviousness rejection, they're relying on Palmier or Thompson for expressly teaching this limitation. And then in the request for hearing, they said it inherently teaches this limitation. If you look at their third party request for re-examination, there's one paragraph here where they mention the word design choice one. And they say, accordingly this carries no patentable weight. But even if it does, if you look down the next, even if it does carry patentable weight, this limitation, Thompson expressly teaches it. And then they go on seven pages later and say Palmier expressly teaches it. So that argument is not the same argument made here. The decision before this court is not whether the court thinks that some other rejection would be better. The issue before this court is whether the rejection that the board actually reviewed, they reviewed it correctly. And I hear Judge Newman's concerns here. And my response to the concern is the USPTO is very aware of its requirement to issue valid patents. And the USPTO is also very aware of the need, even on re-examination, even in inter-parties re-examination to issue valid patents. But the mechanism by which we would consider this other argument is not available to the third party requester under this particular circumstance. What is available to help allay these sort of equitable concerns here is when the examiner adopted their rejection, and again they made two rationales for the rejection. When the examiner adopted their rejection, although they did not have a right to appeal the examiner's not using both of their rationales to appeal that into district court, they could have petitioned the director to also adopt this other rationale. That is available to them. At this point in the proceedings, where we're at now is we're considering what the board did and whether what the board did was right. I and the agency believe that the board did the right thing on this record. Now what happens at this point when there appears that there might be a problem with patentability? Well, there are things that can happen. There are three different things that could happen and guidance from this court would be appreciated on that point if this court thinks the agency overlooked something. One is the director can issue an ex parte re-exam sui sponte. The other is the board can enter a new ground of rejection on its own. The other is the central re-exam unit can reopen prosecution. All of these things have taken place after decisions by this court, after these things can happen. That's completely within your discretion. All of those, I'm not disputing that, but as I think you indicated, are completely within your discretion. Right. We don't have the authority to order you necessarily. We have to follow the system outlined by Congress. And Congress set up this system on how inter-parties re-examination is supposed to go. The agency follows this procedure. You're saying that the new statute that was enacted says that the agency in re-examination doesn't have to do a thorough re-examination depending on what's brought to their attention by the petitioner? Well, we're not under AIA right now. In the statute that we have before us, there are stoppals provisions. That's Congress' notice to third-party requesters. Come in. We're providing you this lower-cost way to challenge the validity of a patent. Come here. Make your best argument. And if you don't, we're not going to let you use this cheap proceeding to make your not-best arguments and then go back into district court and make your very best argument. And the fact of the matter is, this KSR-based argument, your design choice, appeared for the first time in their reply brief. You're telling us that the PTO's re-examination decision, at least before the AIA, should get absolutely no deference from anybody because you're not going to consider everything, just what's been raised on the re-examination? No, Your Honor. That is not the agency's position. The agency is not shirking its responsibility. We are not shirking our responsibility. We are saying to you that there are procedural pathways that must be followed and that the agency does not view that it is its responsibility at this stage in the proceeding, and while the third-party requester has its opportunity to make its best arguments, that it is not our responsibility at that point to go in like cowboys and try to find every piece, every ground for the third-party requester, under which a patent may be found invalid. That's not our duty, and that very much so is not the question before this court. This court is to review the board's reversal of a rejection that the examiner made, and to the extent that the court is unsatisfied with what they think might be the end of the process, this court has in the past, and can in this case, provide some, although they cannot mandate the USPTO take action, I think the case law makes clear, this court can certainly provide guidance to the agency that the agency can and should look at this other ground when it comes back. Now, the agency, as I've explained, on its own, has three ways to realize this other question. But just before you conclude, I just want to assure you that the comments made from the bench here were not intended to suggest that we think the PET PTO ought to be acting as a cowboy. Rather, it was geared towards the fact that this obviousness contention was always on the table. It involved the combination of Horton and Thompson, and whether or not the precise words that KSR uses were raised below, there was an obviousness rejection on the table. It wasn't to suggest that we think the PTO… Your Honor, we're not… Let me finish my sentence. Sorry. It was not to suggest that the PTO ought to be acting like a cowboy going in. Your Honor, respectfully, that obviousness rejection, although it was an obviousness rejection, Rexner had argued throughout it that it was based upon an express teaching of the limitation. That was their position throughout. And if you look at their appeal brief to the board and even their request for a hearing, if you look at the request for their hearing in A34, you'll see that they say that this is an anticipation rejection and it's based on an inherent disclosure. That's what they said in the request for a hearing. Then they never raised that argument the way that you're saying from their initial request for a third-party reexamination all through prosecution. What they said is we have an express teaching or we have an inherent teaching, and that's why it's a 102 rejection. And even if we're talking about the 103 rejection, it's based on a teaching in Palmier and Thompson of that limitation. And if they want that other rationale to be considered, the other – they have two options available to them after this proceeding. Well, I think you've exceeded your time, and I think we've already heard the remarks being made. Okay. Thank you. I must say your time has been exhausted, but we'll give you two minutes if you can speak speedily, and it would be helpful if you would discuss the merits of why this decision should be sustained. Thank you, Your Honor. May it please the Court, my name is Matt Bailey. I'm here on behalf of Habitat Belting, the patent owner here, and right to the point of why there is not a patentability problem. There was a very thorough administrative record established here under the inter-parties reexamination procedures that entitles my client, Habitat Belting, to rely upon an estoppel effect upon Rexnar. We have run this process to its end. We have a success. We are entitled to an adjudication on the record as it stands. What about the obviousness contentions involving Korten and Thompson? Absolutely. With respect to the 10-millimeter fiction that counsel Rexnar has created, this case is not about 10 millimeters, Your Honors. This case is about a highly engineered piece of plastic that is used in industrial commercial belts. There are several components of the claim, elements of the claim that define the space that has a 10-millimeter size. There is a first link end, a second link end, a corrugated portion, and then on top of it, a web. The claim very clearly defines that the space, which has a 10-millimeter size limitation, is defined by the first and second link ends and the web. This is not about size. This is about the interrelationship of the precisely defined components in the claims. To shed some light on this idea that mechanical technologies are simple and scalable, we respectfully disagree. Take a look at the grandfather clock, the table clock, the wristwatch. We're not going to be able to put a mechanical watch on the head of a pin. That's impossible. It's not obvious. The mechanical technologies in this case have sits a bit, are not scalable, and they are at the right stage to achieve the intended result, which is to prevent finger pinches as these complex belts run, and they run around corners. Again, highly engineered pieces of plastic. Havasut submits that the patent is valid, or they are, no matter what combination is presented, and should be entitled to rely upon the estoppel effect of the interparty's reexamination procedures. Okay. Thank you. In response to the comments we just heard about how this case is not about 10 millimeters, I wish you would take a look at pages 7 through 10 of the director's brief, where the director does a very thorough job of explaining the prior art, and comes to the exact conclusion that all we got left here to talk about as far as patentability is concerned is 10 millimeters. These two can't get their act together, which I think is telling. The other thing is the director has once again misrepresented the record. The director is not taking seriously their obligation to understand what this case is about. Not only was this mentioned, not only did we refer to this obviousness argument, not the closed space argument obviousness part, but the common sense obviousness based on Thompson and Horton in our request to reexam, but we also mentioned it in Rexnord's response to a non-final office action, page 9. It's dated August 19, 2005. It's unfortunately not in the appendix, but it's in the record. That's early on. We're subsequent to that. Okay. And then she says, we never mentioned KSR in our brief in front of the board. Take a look at her opening brief to the board, which was at A128. Right in the middle of the page, we talk about these claims, the main claims, are unpatentable over Horton in view of Thompson, and then right below that we cite section 103A, which last time I looked at it was obviousness. We made the obviousness argument there. We go on and we're talking again, not just about the theory that a closed space is a space that's less than 10 millimeters, but in the next sentence that begins the very last paragraph, we say Thompson goes beyond. This is beyond, above and beyond, in addition to. You're at A128? A128, the paragraph that's at the very bottom of the page that carries over to the next page. Oh, I see. Okay. Again, are we not using, what do we have to say to these people? What are the magic words they need to hear? And then we go on to say that Horton teaches at least partially to cover the gaps, to modify Horton with Thompson to each at least partially cover the gap. We're not relying on the closed space theory there. And then she says we never mentioned KSR, another falsehood. Take a look at A131. KSR had fairly recently issued, and we bring KSR up at A131 and carry over to 132, where we again mention KSR in connection with Thompson and Horton together under 103, the combination is natural in view of the problem being solved. So the argument that this has not been raised either through examination or in front of the board, it's false. And that's all they have to go on. That's all they have to go on, because they know on the substance they're wrong. I have nothing further. Thank you. Thank you, Mr. Cross. I would especially like to comment about this document that's not in the record. I think if there's anything that you need to tell us, write to the court and give your opponent an opportunity to respond. Thank you. We'll take the case under submission. Thank you. All rise.